UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-23269-CIV-GAYLES/MCALILEY

B&G OPA HOLDINGS, INC., *et al.*,

      Plaintiffs,

vs.

CITY OF OPA-LOCKA, FLORIDA, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATIONS
## ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs and Defendant City of Opa-locka, Florida[1] each filed a motion for summary judgment,[2] which the Honorable Darrin P. Gayles referred to me for a report and recommendation. (ECF Nos. 34, 68, 80). Both Motions are fully briefed. (ECF Nos. 85, 87, 93, 94). I noticed a hearing on the Motions to discuss with counsel questions I have about the remedies Plaintiffs seek. Defense counsel was experiencing a family health emergency and for that reason, I cancelled the hearing. (ECF No. 106). I chose to proceed

---

[1] A second defendant was named in the lawsuit, but dismissed with prejudice pursuant to a stipulation of the parties. (ECF Nos. 54, 62).

[2] Plaintiffs' motion is titled a motion for partial summary judgment. However, two claims for which Plaintiffs do not seek summary judgment, Counts X and XI, have been dismissed by the Court, (ECF Nos. 67, 98), and Plaintiffs previously dismissed Count IV, (ECF No. 54). Plaintiffs seek summary judgment on all remaining claims in their Second Amended Complaint, thereby making Plaintiffs' motion one for full summary judgment on all remaining counts.

with this Report and Recommendation that is limited to issues of liability.[3] After carefully considering the parties' memoranda of law, the pertinent portions of the record and the applicable law, for the reasons set forth below, I recommend that the Court grant both Motions in part.

## I.   BACKGROUND[4]

Plaintiff B&G Opa Holdings, LLC owns and previously operated "Klub 24," a restaurant and lounge that served alcohol and featured nude dancing 24-hours a day; it also owns the associated business licenses. (ECF No. 69 at ¶¶ 1-2). Klub 24 is located in the City of Opa-locka's I-2 industrial district. (ECF No. 69 at ¶ 5). Plaintiff B&G Opa Land Holdings, LLC owns the building and real property where Klub 24 is located. (*Id*. at ¶ 1).[5] Beginning in 2015, before leasing, and later purchasing, the property for Klub 24, B&G's representatives met with City officials to discuss applicable zoning restrictions and the necessary applications to open its business. (*Id*. at 6; ECF No. 81 at ¶ 10; ECF No. 86 at ¶ 10).

### A.   *The Code*

Section 22-81 of the City's Land Development Code (the "Code") permits adult businesses in the City's I-2 zoning area, so long as the City grants a special exception. It

---

[3] If the Court adopts this Report and Recommendation, I believe the parties will be well-positioned to engage in mediation and resolve the remaining disputes between them. If this is not possible, I will direct further briefing on the issues of remedies. I intend to address these subjects with counsel at a status conference, once the Court rules on this Report and Recommendation.

[4] Unless otherwise noted, the facts set forth herein are taken from the parties' respective Statements of Undisputed Material Facts.

[5] The Court refers to both Plaintiffs as "B&G" and will refer to B&G in the singular.

also permits adult businesses in the City's I-3 zoning area, subject to requirements that they be located at prescribed distances from places of worship, schools, parks etc. (ECF No. 81 at ¶¶ 12-13; SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. III at § 22-81, Permitted Uses Table – Industrial Districts).

The special exception process is set out in Section 22-60 of the Code. A special exception will be granted if recommended by the City's Planning Council and approved by the City Commission. Both the Council and the Commission must make their decision guided by these criteria:

1. Compliance with the City's Comprehensive Plan.

2. Consistent with the "character and purpose" of the zoning district.

3. The size, shape and character of the property are suited for the proposed use.

4. Compatibility with the existing uses near the property.

5. Will not adversely affect the development of the general neighborhood or district.

6. Will not generate vehicular traffic or create vehicular circulation or ingress/egress problems or parking demands that have an unfavorable impact on surrounding properties when compared with uses permitted by right in the same district.

7. Potential for fire and/or other equally or greater dangerous hazards.

8. Create an unfavorable environment impacts [*sic*] on surrounding uses (e.g. noise, glare, smoke, dust, odor, fumes, water pollution, or general nuisance).

9. Consistent with existing and planned pedestrian and vehicular circulation adjacent to and near the property.

10. Site is adequately served by essential public services and facilities not requiring additional public expense in infrastructure improvements.

11. Will not adversely affect any site or feature of historical, cultural, natural or scenic importance.

12. Will not be contrary to the public health, safety, and welfare, provided that a denial based exclusively on this language shall include explicitly findings regarding the way in which granting the special exception would be contrary to the public health, safety and welfare.

(ECF No. 82-16 at 2-3, SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT

REGULATIONS, ART. III at § 22-60 B.).

The City's Planning Department must determine whether a special exception application is complete within 45 days of its submission. (ECF No. 82-14 at 2, Code at Art. IIII, § 22-49 D.). Once complete, the Planning Council then provides its recommendation to the City Commission, and the application is placed on the next available regular City Commission meeting agenda. (ECF No. 82-16, Code at Art. III, § 22-60 D.; ECF No. 82-14, Code, § 22-49 G.). The City Commission must then hold a public hearing to either deny or approve the special exception application, or approve it subject to conditions. (ECF No. 82-16, Code at Art. III, § 22-60 E.). The Code does not provide a deadline for the Planning Council to issue its recommendation, nor for the City Commission to make its decision.

In addition to limiting adult businesses to the I-2 or I-3 zoning areas, at the time of the events that gave rise to this lawsuit, Section 22-136 of the Code provided that "adult entertainment uses" are considered "regulated uses,"[6] which "shall be permitted only within the Transit Corridor zoning district." (ECF No. 82-27 at 3-4, Code at Art. V, § 22-136(C), (E)). The City, however, did not then, and does not now, have a Transit Corridor Zoning District, and thus no land in Opa-locka was located in a transit corridor. (ECF No. 86 at ¶ 78; ECF No. 68-18 at 7:22-8:3, 9:1-15). After B&G filed suit – in fact, just a week before B&G filed its Motion – on February 12, 2020, the City revised Section 22-136 to

---

[6] Section 22-136 excludes from the definition of regulated uses a variety of institutions, such as "art galleries", "arts and cultural performance theaters and playhouses" and "professional photography and portrait studios which may use nude subject for their photographs or portraits". (ECF No. 82-27 at 3-4, Code at Art. V, § 22-136 (D)).

remove the Transit Corridor requirement, declaring that this was a scrivener's error. (ECF No. 82-28).

### B.     B&G's Applications and Licenses

Beginning in late 2015, City officials knew that B&G's proposed business included adult entertainment. (ECF No. 69 at ¶ 8). By early 2017, B&G met with the City Attorney and the planning and zoning staff, and discussed that B&G, in its applications, would use the term "playhouse", that featured a restaurant and bar, to describe B&G's proposed business. (*Id.* at ¶¶ 9-10).

On January 4, 2017, B&G submitted a zoning verification form and application for certification of use which identified the proposed use of its property as "tavern, bar, playhouse." (ECF No. 69 at ¶ 10; ECF No. 81 at ¶ 20). City staff completed portions of these applications to reflect that Planning Council and City Commission approval was required for adult entertainment in the I-2 zoning district. (ECF Nos. 82-18, 82-19). Also on January 4, 2017, B&G submitted an application for an occupational license which identified the business as "tavern, bar, playhouse," but also included the phrase "other" and had the words "adult entertainment" crossed out.[7] (ECF No. 82-17). That same day, the City issued B&G a certificate of use and an occupational license to engage in the business of "other clubs." (ECF No. 82-21; ECF No. 82-6 at ¶ 14).

---

[7] As discussed *infra*, the parties dispute whether B&G's representative or a City official crossed out the phrase "adult entertainment," and dispute whether B&G's representative wrote the term "playhouse" in the description of intended use based upon the advice of City officials. **s**

The next day, a City license clerk wrote to B&G that the license category "other" includes "the description as written in the approval application for certificate of use, playhouse, bar, tavern *approved adult entertainment* [*sic*]." (ECF No. 82-22) (emphasis added). The City maintains that the license clerk did not have the authority to issue this letter. The license clerk, however, states that she did so at the direction of the former City Manager. (ECF No. 86 at ¶ 63). On January 6, 2017, the Director of the City's Planning & Community Development Department advised B&G that its "proposal to operate a playhouse/cabaret…has been determine[d] to be interpreted as an adult business. A special exception process is required for properties zoned I-2 to determine if the adult business proposal would be allowed under certain conditions." (ECF No. 82-23). The Director repeated this information in correspondence to B&G in July 2017. (ECF No. 82-25). B&G did not apply for nor receive a special exception. (ECF No. 81 at ¶¶ 28, 46).

### C.     *B&G's Short-Lived Operation of Klub 24*

After purchasing and completing renovations to the property, on January 17, 2018 B&G applied for and received a Temporary Certificate of Occupancy, which identified the use and occupancy as "[r]emodeling for existing restaurant lounge/cabaret." (ECF No. 69 at ¶ 18; ECF No. 82-33). The next day, Klub 24 opened for business. (ECF No. 69 at ¶ 23). The Temporary Certificate of Occupancy gave B&G until April 20, 2018 to "comply with…all ordinances or building codes of the City of Opa-locka, the Florida Building Code, and all other ordinances and laws applicable pertaining to the erection, construction, alteration, remodeling [sic] or use of buildings or structures." (ECF No. 82-33).

In addition to the building that housed Klub 24, the property also had a sign structure. (ECF No. 81 at ¶ 35; ECF No. 88 at ¶¶ 35-37). Article X of the Code regulates signs and requires sign permits. (SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. X). B&G displayed a digital sign at the property, but did not obtain a permit. ECF No. 81 at ¶ 35; ECF No. 88 at ¶¶ 35-37).

On January 24, 2018 and March 28, 2018, the City Commission held public hearings to discuss B&G's operation of Klub 24. (ECF No. 81 at ¶ 42; ECF Nos. 82-34, 82-35). At the second hearing, the Commission passed a resolution "authoriz[ing] the closure of Klub 24 and direct[ing] the City Manager to do all that is necessary to ensure the closure of Klub 24 until it is in full compliance with all State, County and Municipal laws and ordinances." (the "Resolution"). (ECF No. 82-35 at 10, 12). Shortly thereafter, on April 3, 2018, City officials met with B&G's representatives including its attorneys. The parties dispute what took place at that meeting, and its purpose. (ECF No. 81 at ¶ 42; ECF No. 88 at ¶ 42).

Ten days later, on April 13, 2018, the City Manager issued a cease and desist letter that ordered B&G to "cease and desist all operations until a business license is properly obtained." (ECF No. 82-37). The City Manager provided two justifications: (1) B&G's license "was obtained by misrepresentation of material facts and therefore, by operation of law, [B&G] is operating in the City of Opa-locka ("City") without a license" and (2) B&G's "Adult Entertainment Business, known as Klub 24, is in violation of Section 22-81 of the City's Land Development Regulations for failing to obtain a special exception to operate in the I-2 Zone." (*Id*.). That same day, law enforcement officers served the cease and desist

7

order on B&G and directed them to close Klub 24. (ECF No. 69 at ¶ 28). B&G complied, and Klub 24 has remained closed. (*Id.* at ¶ 30). Three days after closure of Klub 24, B&G filed a lawsuit against the City for declaratory and injunctive relief, in the Circuit Court for Miami-Dade County (Case No. 2018-011909-CA-01). (ECF No. 81 at ¶ 44). That lawsuit was dismissed for lack of prosecution on September 3, 2020.

### D.    This Action

The operative pleading is the Second Amended Complaint ("SAC"). (ECF No. 46). B&G seeks declaratory and injunctive relief, and damages, for the City's alleged violations of B&G's rights under the First Amendment and Due Process Clause of the United States Constitution. B&G later dismissed Count IV, (ECF No. 54), and the City filed a Motion to Dismiss the remaining claims. (ECF No. 55). The Court granted the Motion to Dismiss in part, and dismissed Count X without prejudice and XI with prejudice. (ECF Nos. 67, 98). B&G did not thereafter amend its complaint. Thus, Counts I, II, III, V, VI, VII and VIII of the SAC are at issue.[8] They allege the following:

> Count I: Sections 22-81 and 22-136 of the Code fail to provide sufficient locations where adult businesses may operate as a matter of right, in violation of the First Amendment. (ECF No. 46 at ¶¶ 66-81).

> Count II: Section 22-60 of the Code, which requires certain businesses located in the I-2 zone to obtain a special exception, is an unconstitutional prior restraint in violation of the First Amendment. (*Id.* at ¶¶ 82-96).

> Count III: the City violated B&G's due process rights by closing Klub 24 and revoking B&G's licenses and permits without advance notice and an opportunity to be heard. (*Id.* at ¶¶ 97-122).

---

[8] The City filed an Answer and Affirmative Defenses, (ECF No. 101), which, because of scheduling deadlines that were set well before, took place after the Motions for Summary Judgment were fully briefed.

Count V: the Resolution is an impermissible content-based law that imposed an unlawful prior restraint on B&G's First Amendment right to freedom of expression. (*Id*. at ¶¶ 138-178).

Count VI: the term "adult business" in the Code is unconstitutionally vague and overbroad. (*Id*. at ¶¶ 147-153).

Count VII: the terms "sexual conduct," "caressing or fondling" and "simulation thereof," in section 4-16 of the City's Code of Ordinances, are unconstitutionally vague or overbroad. (*Id*. at ¶¶ at 154-162).

Count VIII: the City's Sign Code violates the First Amendment because it regulates on the basis of content and imposes an unconstitutional prior restraint. (*Id*. at ¶¶ at 163-197).

Both parties ask the Court to enter summary judgment on their behalf on all claims.

## II.   ANALYSIS

### A.   *Summary Judgment Standard*

Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "An issue is 'genuine' when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof." *See Picardat v. City of Miami*, No. 15-cv-24305-GAYLES, 2017 WL 1251897 at * 1 (S.D. Fla. April 5, 2017) (citing *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014)). A material fact is one that, under the applicable law, might affect the outcome of the case. *See Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

9

*genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A genuine dispute of material fact exists "when there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Jessup v. Miami-Dade County*, 440 Fed. App'x. 689, 691 (11th Cir. 2011) (quotation marks and citation omitted).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (citation omitted). The moving party must show that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id.* at 1438. "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (quotation marks and citations omitted); *see also Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed. App'x 819, 825 (11th Cir. 2009) (once the moving party satisfies its burden, "the non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof.") (quotation marks and citation omitted).

When the nonmoving party bears the burden of proof at trial, the moving party can show either "that there is an absence of evidence to support the nonmoving party's case" or support its motion "with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d at 1438 (citation omitted). "If the moving party

10

shows the absence of a triable issue by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Id*. at 1438 (citations omitted). "If the nonmoving party fails to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof, the moving party is entitled to summary judgment." *Id*. (quotation marks and citation omitted).

The Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the nonmoving party. *Ray*, 327 Fed. App'x at 825. In order to defeat summary judgment, "the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts," *id*. at 825, and "must offer more than a mere scintilla of evidence for its position...." *Picardat*, 2017 WL 1251897 at *1 (citation omitted). "If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Sada v. City of Altamonte Springs*, 434 Fed. App'x 845, 847 (11th Cir. 2011) (citation omitted).

With these requirements in mind, I turn to each disputed claim.

### B.      *B&G is Entitled to Summary Judgment on Count I*

B&G argues that the Code's provisions regarding adult businesses violated the First Amendment because the Code failed to provide adequate sites where those businesses can operate. (ECF No. 68 at 3-7).

Section 22-81 of the Code provides that adult businesses can locate in the City's I-3 zone as a matter of right, or in the City's I-2 zone if a special exception is obtained. *See* SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. III at § 22-81.

11

That Section of the Code must be read in conjunction with Section 22-136, which is titled "Regulations of Adult Entertainment Establishments", *Id*. at Art. V, § 22-136, and refers to adult entertainment as "regulated uses." *Id*. at § 22-136 (C). Section 22-136 (E) mandates that regulated uses be located no closer than prescribed distances from certain places, such as schools, public parks and places of worship and, at the time of the events that gave rise to this lawsuit, further required that regulated uses be located in the Transit Corridor zoning district. *Id*. at § 22-136 (E) ("Regulated uses shall be permitted only within the Transit Corridor zoning district."). As noted, well after this lawsuit was filed, the City revised Section 22-136 (E) to remove the Transit Corridor requirement. (ECF No. 82-28).

In *City of Renton v. Playtime Theatres, Inc.*, the Supreme Court held that a zoning ordinance that restricts the location of adult entertainment establishments must be "designed to serve a substantial governmental interest and allow for reasonable alternative avenues of communication." 475 U.S. 41, 50 (1986). Here, the parties do not dispute that the challenged sections of the Code serve a substantial governmental interest. They do dispute, however, whether there were sufficient available sites in the City where adult businesses could locate – which is what the Court meant by "reasonable alternative avenues of communication". This is a question of law.[9] "The [City] bears the burden of proffering the number of sites which are legal for adult businesses under the challenged regulations; the burden then shifts to Plaintiffs to establish that any of them are disqualified." *University*

---

[9] "Whether the sites available for adult businesses under a zoning ordinance provide reasonable avenues for communicating these businesses' erotic message is a question of law." *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1309 (11th Cir. 2003) (citation omitted).

*Books and Videos, Inc. v. Miami-Dade County*, 132 F.Supp.2d 1008, 1013-14 (S.D. Fla. 2001) (citations omitted).

The City contends that "there are at least 27 parcels in the City's I-3 zoning area where adult businesses may locate as a matter of right." (ECF No. 80 at 7). The problem with the City's argument is that none of those parcels were in the Transit Corridor because, as the City acknowledges, it "has no Transit Corridor Zoning District." (ECF No. 86 at ¶ 78).[10]

Faced with these undisputed facts, the City asks the Court to disregard the Transit Corridor requirement because (1) it was "a scrivener's error" and (2) the City did not rely upon the Transit Corridor requirement in any communications with B&G. (ECF No. 92 at 2). I cannot agree. First, the City offers no evidence that the Transit Corridor requirement was a "scrivener's error", other than the conclusory resolution that that says so. (ECF No. 82-28). This self-serving statement, alone, would not support a reasonable jury concluding that the Transit Corridor requirement was indeed a scrivener's error.

Second, even if the City did not rely upon the Transit Corridor requirement, it was a provision of the Code when B&G sought to open Klub 24. The City's argument that the recent revision of Section 22-136 (E) renders Count I moot is without merit. (ECF No. 92 at 2). The fact that the Code today does not contain the Transit Corridor requirement does

---

[10] The City's expert conceded that he found no parcels within the City that were in a transit corridor. (ECF No. 68-18 at 8:1-3, 9:1-15).

not absolve the City of liability, as the parties were bound by the Code as it was written at the time.

Given the complete absence of land in the Transit Corridor Zoning District, it is an undisputed material fact that, at the time B&G opened Klub 24, the City had no sites where an adult business was entitled to operate. A zoning ordinance that "effectively zone[s]" an adult business "out of existence" is unconstitutional under the First Amendment. *Fly Fish*, 337 F.3d at 1312.

For the foregoing reasons, I conclude that section 22-136 of the City's Land Development Regulations, as written prior to its February 2020 revision, was unconstitutional because it failed to provide sufficient alternative avenues of communication for adult businesses. Accordingly, B&G is entitled to summary judgment as to liability on Count I.

### C.      *B&G is Entitled to Summary Judgment on Count II*

Section 22-81 of the Code requires that certain businesses, including adult businesses, obtain a special exception in order to locate in the City's I-2 zone, and Section 22-60 of the Code sets out that process. B&G contends that the special exception requirement is an unconstitutional prior restraint on First Amendment protected activity. (ECF No. 68 at 7-11). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969). The special exception requirement here is the equivalent of a license, something the parties do not dispute. *See Lady J. Lingerie, Inc. v. City of*

*Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) ("…to operate in the CCG-2 zone, an adult entertainment establishment must apply for an exception. This makes an exception the equivalent of a license.").

Although a prior restraint is "not unconstitutional *per se*," it "comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (citations omitted). The Court identified "two evils" that will not be tolerated in a licensing scheme. *Id*. at 225. The first is a scheme that gives government officials "unbridled discretion." *Id*. at 225-26 (citations omitted). Second is a scheme that "fails to place limits on the time within which the decisionmaker must issue the license…." *FW/PBS, Inc.*, 4937 U.S. at 226. The special exception provisions found in Section 22-60 of the Opa-locka Code fail on both counts.

Regarding the "evil" of unbridled discretion, the Supreme Court explained, "[i]t is settled by a long line of recent decisions of this Court that an ordinance which … makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth*, 394 U.S. at 151. "[V]irtually any amount of discretion beyond the merely ministerial is suspect." *Lady J. Lingerie*, 176 F.3d at 1362.

Section 22-60 provides that "[S]pecial Exceptions may be approved by the City Commission after recommendation from the Planning Council." SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. III at § 22-60. Section 22-60 B.

prescribes twelve criteria the Planning Council and City Commission must use "in making their decision regarding approval or disapproval of a … Special Exception application." *Id*. at § 22-60 B. 1-12. To survive a First Amendment challenge, these criteria "must be *precise* and *objective*". *Lady J. Lingerie*, 176 F.3d at 1362 (emphasis in original) (citations omitted).

The Eleventh Circuit, in *Lady J. Lingerie*, examined a provision of the Jacksonville Land Use Code that set out nine criteria the zoning board had to consider in deciding whether to grant special exceptions. *Id.* at 1362, 1369. The Court found that "none of the nine criteria is precise and objective." *Id.* at 1362. It stated that "individually and collectively [they] empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general 'compatibility' or 'environmental' considerations." *Id*. Many of the criteria found impermissible in *Lady J. Lingerie* are strikingly similar to the criteria in Section 22-60 B. of the Opa-locka Code, as the following table demonstrates:

| Impermissible Criteria in *Lady J.* | Section 22-60 B. of the Opa-locka Code |
|---|---|
| Will be compatible with the existing contiguous uses or zoning and compatible with the general character of the area, considering population density, design, scale and orientation of structures to the area, property values, and existing similar uses or zoning. (Jacksonville Land Use Code at § 656.131(c)(1)(ii)); *Lady J. Lingerie*, 176 F.3d at 1369. | Compatibility with the existing uses near the property. (§22-60.B 4.)<br><br>Consistent with the character and purpose of the zoning district. (§22-60 B 2.) |
| Will not have an environmental impact inconsistent with the health, safety and welfare of the community. (Jacksonville | Create an unfavorable environment impacts [sic] on surrounding uses (e.g. noise, glare, smoke, dust, odor, fumes, |

| | |
|---|---|
| Land Use Code at § 656.131(c)(1)(iii)); *Lady J. Lingerie*, 176 F.3d at 1369<br><br>Will not result in the creation of objectionable or excessive noise, lights, vibrations, fumes, odors, dust or physical activities, taking into account existing uses or zoning in the vicinity. (Jacksonville Land Use Code at § 656.131(c)(1)(vi)); *Lady J. Lingerie*, 176 F.3d at 1370. | water pollution, or general nuisance). (§22-60 B 8.) |
| Will be consistent with the Comprehensive Plan, including any subsequent plan adopted by the Council pursuant thereto. (Jacksonville Land Use Code at § 656.131(c)(1)(i)); *Lady J. Lingerie*, 176 F.3d at 1369. | Compliance with the City's Comprehensive Plan. (§22-60 B 1.) |
| Will not have a detrimental effect on the future development of contiguous properties or the general area, according to the Comprehensive Plan, including any subsequent amendment to the plan adopted by the Council. (Jacksonville Land Use Code at § 656.131(c)(1)(v)); *Lady J. Lingerie*, 176 F.3d at 1370. | Will not adversely affect the development of the general neighborhood or district. (§22-60 B 5.) |
| Will not have a detrimental effect on vehicular or pedestrian traffic, or parking conditions, and will not result in the generation or creation of traffic inconsistent with the health, safety and welfare of the community. (Jacksonville Land Use Code at § 656.131(c)(1)(iv)); *Lady J. Lingerie*, 176 F.3d at 1370. | Will not generate vehicular traffic or create vehicular circulation or ingress/egress problems or parking demands that have an unfavorable impact on surrounding properties when compared with uses permitted by right in the same district. (§22-60 B 6.) |

The Court need not analyze the remaining criteria listed in Section 22-60 B. because the above-referenced criteria are plainly impermissible under *Lady J. Lingerie*, and this is sufficient to render the special exception scheme an unconstitutional prior restraint.

Section 22-60 also suffers from the second "evil" – it "fails to place limits on the time within which the decisionmaker must issue the license…." *FW/PBS, Inc.*, 4937 U.S. at 226. The City correctly points out that there is a 45-day deadline to determine if a special exception application is complete, *see* Art. III at § 22-49 D., and "[a]ll recommendations and findings of fact by the Planning Council [must] be placed on the next available regular City Commission meeting agenda…." *Id.* at § 22-49 G. There are, however, *no* deadlines within which the Planning Council must issue its recommendation, or the City Commission must make a decision. The City's "failure to require a deadline for decision renders [Section 22-60] unconstitutional." *Lady J. Lingerie*, 176 F.3d at 1363 (Jacksonville ordinance an unconstitutional prior restraint because it required zoning board to "hold a public *hearing* within 63 days after a business applies for an exception…[b]ut nothing require[d] a *decision* within 63 days, or any other time period") (emphasis in original).

For these reasons, I conclude that, with respect to businesses entitled to First Amendment protection, the special exception requirement set forth in Sections 22-60 of the City's Land Development Regulations is an unconstitutional prior restraint. Accordingly, B&G is entitled to summary judgment on liability on Count II.

### D.   *Neither Party is Entitled to Summary Judgment on Count III*

B&G argues that the City violated its procedural due process rights by directing the closure of Klub 24 and revoking its license without notice or an opportunity to be heard. (ECF No. 68 at 11-15). In order to prove a procedural due process violation, B&G must establish three elements: (1) "deprivation of a constitutionally protected liberty or property

interest;" (2) "state action;" and (3) a "constitutionally inadequate process." *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994).

Regarding the first element, the City argues that B&G does not have a constitutionally protected property interest in the occupational license because B&G procured it through misrepresentations. (ECF No. 85 at 7; ECF No. 80 at 9-10). Specifically, the City contends that B&G misrepresented the intended use of the property on its applications as a "tavern, bar playhouse," and submitted an application for an occupational license that had the phrase "adult entertainment" crossed out. (ECF No. 85 at 7; ECF No. 80 at 9; ECF No. 86 at ¶¶ 59-60). B&G disputes this and contends that the City knew that B&G intended to operate a nude dancing facility, and that the City Attorney agreed that B&G classify itself as a playhouse, which eliminated the need to obtain a special exception. (ECF No. 88 at ¶¶ 15-18). The City denies B&G's version of events. (ECF No. 86 at ¶¶ 57-58). B&G also disputes that its representative crossed out the phrase "adult entertainment"; it contends that the change must have been done by someone in the City's licensing department. (ECF No. 88 at ¶ 19). Plainly, there is a genuine dispute of material fact regarding whether B&G had a constitutionally protected property interest.

There are also disputed material facts regarding the third element – a constitutionally inadequate process. "Due process entitles an individual to notice and some form of hearing before state action may finally deprive him or her of a property interest." *Cryder*, 24 F.3d at 177. The City argues that it provided B&G with a predeprivation hearing on April 3, 2018, ten days before issuance of the cease and desist letter, when the City Manager, Building Official and City Attorney met with B&G representatives and its

19

attorney. (ECF No. 80 at 11, ECF No. 81 at ¶ 42). The City characterizes this as a "due process hearing" where "the City provided B&G with an opportunity to present any argument and evidence related to the lawfulness of their operation of the adult entertainment club." (ECF No. 81 at ¶ 42).

B&G agrees that the meeting took place, but disputes that it was a due process hearing. (ECF No. 87 at 11-12; ECF No. 88 at ¶ 42). It states the meeting "was just one of a long series of conferences between the parties which had occurred over the years," (ECF No. 88 at ¶ 42), and that the City did not give it notice "that the meeting would address any issue in particular." (ECF No. 87 at 11). B&G points to a draft letter from the then-City Manager as evidence that the April 3rd meeting was not a predeprivation hearing. The City Manager wrote the letter after April 3rd to notify B&G that the City "has set a date, time and place for the License Revocation Hearing on this matter." (ECF No. 68-25).[11] Neither party submitted evidence about what they discussed at the April 3rd meeting.

Whether B&G received a predeprivation hearing is mired in significant factual disputes that preclude summary judgment on this claim.

The City also argues, alternatively, that B&G has an adequate post-deprivation remedy, in the form of a lawsuit, that satisfies procedural due process. (ECF No. 80 at 11-12; ECF No.85 at 9-10). I rejected this argument in my Report and Recommendation on the City's Motion to Dismiss Second Amended Complaint, (ECF No. 67 at 9-14), which the Court adopted, (ECF No. 98). The City offers nothing new to justify its position.

---

[11] The City Manager who prepared the draft letter was thereafter fired, and the letter was not sent. (ECF No. 68-33 at 81:4-19).

As I noted in my earlier Report and Recommendation, the Supreme Court instructs that if the state can feasibly provide a predeprivation hearing, it must generally do so "regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). Exceptions to this rule exist where there are exigent circumstances, *see e.g., Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009), or "where the deprivation is the result of either a negligent or an intentional deprivation of property." *Nat'l Ass'n of Boards of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1317 (11th Cir. 2011). There is no evidence – or contention – that any of those exceptions occurred here.

Importantly, the Eleventh Circuit recently rejected the argument the City makes, reasoning that to hold otherwise would mean "gutting any notions of predeprivation due process and blanketly holding that a state can effectuate any and all deprivations under a 'shoot first, ask questions later' mentality, so long as it offers ex post facto recourse." *Barr v. Johnson*, 777 F. App'x 298, 303 (11th Cir. 2019) (holding that small business owner stated a procedural due process claim against city and its officials after they forcibly closed her business, without warning, for not having the required license.). The City makes no mention of, or attempt to distinguish, *Barr*, despite the obvious similarities between both cases.

In sum, summary judgment on Count III is not warranted, given the genuine disputes of material fact regarding whether a procedural due process violation occurred.

21

### E.      The City is Entitled to Summary Judgment on Count V

In Count V, B&G contends that the Resolution is an impermissible content-based law that imposed an unlawful prior restraint on B&G's First Amendment right to freedom of expression. (ECF No. 40, ¶¶ 138-178). The Resolution found that Klub 24 was not in compliance with various provisions of the Opa-locka Code of Ordinances and directed its closure.

Content-based laws target speech based upon its communicative content and are "presumptively unconstitutional." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). As the Supreme Court explained,

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys.  Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

*Id*. at 163-64 (citations omitted).

Laws that are facially content neutral will be considered content-based regulations if they "cannot be justified without reference to the content of the regulated speech" or "were adopted by the government because of disagreement with the message the speech conveys." *Id*. at 164. (quotation marks and citation omitted).  Content-based laws are subject to strict scrutiny "regardless of the government's benign motive, content-neutral

justification, or lack of animus toward the ideas contained in the regulated speech." *Id*. at 165.

B&G has not carried its burden, on summary judgment, to establish that the Resolution is a content-based law. B&G argues, in a conclusory fashion, that because the Resolution shut down its enterprise - which engages in First Amendment protected activity - that it is an impermissible content-based law.[12] B&G does so by selectively identifing only one provision of the Resolution, and arguing that this makes the Resolution content-based:

> WHEREAS, the City Commission finds that it is in the best interest of the City that the City Manager take all necessary steps to revoke Klub 24's license to operate an adult entertainment establishment, until it is in full compliance with all applicable laws and City ordinances.

(ECF No. 87 at 15-16) quoting the Resolution (ECF No. 82-30 at 2). B&G asserts that the phrase "to operate an adult entertainment establishment" is all the proof needed that the Resolution is a content-based enactment. (ECF No. 87 at 15-16).

In fact, the Resolution, read as a whole, directs the closure of Klub 24 because it is not in compliance with a number of provisions of the Opa-locka Code which, important to a First Amendment analysis, apply to businesses *regardless* of the message the business conveys. The Resolution references Sections 22.81 (special exception requirement),

---

[12] Notably, in its Motion for Summary Judgment, B&G makes no substantive argument why the Court should grant summary judgment in its favor on this Count. (ECF No. 68). It addresses the merits of Count V only in response to arguments the City raised, and does so in a superficial manner. (*See* ECF No. 87 at 15-16; ECF. No. 94 at 5-6).

Section 4-17 (nudity in premises that serve alcoholic beverages) and Section 4-5 (hours for nightclubs), and references an opinion of the City Attorney that Klub 24 was not permitted to operate in the City at that time. On this basis, the Commission authorized the closure of the enterprise, and instructed the City Manager to ensure closure "until it is in full compliance with all State, County and Municipal laws and ordinances." (ECF No. 82-30 at 2).

The special exception requirement is not limited to adult entertainment businesses; it also applies to businesses in the I-2 zone that concern "cement and clay products" and "shipping container[s]," which do not implicate any First Amendment concerns. *See* SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. IV at § 22-81.

Similarly, the prohibition on total or partial nudity applies to all "alcoholic beverage establishments" which is defined as "any establishment located in the City of Opa-locka, Florida at which alcoholic beverages, beer or wine are offered for sale for consumption on the premises." *See* Code of Ordinances, City of Opa-locka, Florida at §§ 4-16(2), 4-17. This ordinance is equally applicable to a neighborhood bar and grill restaurant as it is to an adult entertainment business. And Section 4-5 limits the hours that *all* "nightclubs" can offer or sell "alcoholic or intoxicating beverages." *See* Code of Ordinances, City of Opa-locka, Florida at § 4-5.

For these reasons, B&G has not shown that the Resolution "cannot be justified without reference to the content of the regulated speech" or that the Resolution was "adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. at 164. There is nothing on the face of

24

the Resolution that displays this motive, nor is there any other evidence in the record that does so. The Resolution authorizes the closure of Klub 24 because it failed to meet regulatory requirements that apply to businesses irrespective of the message the business conveys, not because Klub 24 provides adult entertainment.

The City has carried its burden and shown that, based upon the undisputed material facts, no reasonable jury could conclude that the Resolution was a content-based enactment. As such, the Resolution did not violate B&G's First Amendment rights as a matter of law and the City is entitled to summary judgment on Count V.

### F.   *The City is Entitled to Summary Judgment on Count VI*

B&G claims that the definition of "Adult business," set forth in Section 22-238 of the Code, is unconstitutionally vague and overbroad. (ECF No. 68 at 17). Section 22-238 defines an "Adult business" as

> Any premises within the city where members of the public, or any person for consideration, are offered any live or recorded performance, or any visual image tangibly fixed in any medium, which performance, image, or recording has as its *primary or dominant theme* subject matter depicting, describing, or relating to *specified sexual activities or specified anatomical areas***,** and which performance, recording, or visual image requires the exclusion of minors from the premises *pursuant to F.S. ch. 847*."

*See* Sustainable 2015 Opa-Locka Land Development Regulations, Art. XI at § 22-238 (emphasis added).

To succeed on a claim that an ordinance is void for vagueness, "the complainant must demonstrate that the law is impermissibly vague in *all* of its applications." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (citation omitted)

(emphasis added). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Precision, though, is not required. As the Eleventh Circuit recently reiterated, "[t]he Constitution does not require perfect clarity in the language of statutes and ordinances. All due process requires is fair notice sufficient to enable persons of ordinary intelligence to avoid conduct which the law forbids." *Stardust*, 899 F.3d at 1176 (quotation marks and citation omitted); *see also Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir. 1980) ("A provision need not, however, be cast in terms that are mathematically precise; it need only give fair warning of the conduct proscribed, in light of common understanding and practices.") (citations omitted).[13]

B&G argues that the definition of "Adult business" is unconstitutionally vague because it does not define "specified sexual activities" and "specified anatomical areas." (ECF No. 68 at 17). This argument fails to recognize that the definition expressly references Florida Statutes Chapter 847, which provides the requisite specificity. Florida Statutes § 847.001 defines the term "specific sexual activities" as follows:

> "Specific sexual activities" includes the following sexual activities and the exhibition of the following anatomical areas:
>
> (a) Human genitals in the state of sexual stimulation or arousal.

---

[13] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

(b) Acts of human masturbation, sexual intercourse, sodomy, cunnilingus, fellatio, or any excretory function, or representation thereof.

(c) The fondling or erotic touching of human genitals, the pubic region, the buttocks, or the female breasts

(d) Less than completely and opaquely covered:

1. Human genitals or the pubic region.

2. Buttocks.

3. Female breasts below the top of the areola.

4. Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

Fla. Stat. § 847.001(20). This definition details the specific "sexual activities" and "anatomical areas" referenced in the definition of "Adult business" and does so clearly. Thus, when the definition of "Adult business" is read in conjunction with section 841.007(20), it is "sufficiently specific that a person of ordinary intelligence could reasonably understand" the conduct to which it applies.[14] *See Joel v. City of Orlando*, 232 F.3d 1353, 1360 (11th Cir. 2000); *see also Stansberry*, 613 F.2d at 1290 ("The definition,

---

[14] In the SAC, B&G does not seek any relief with respect to the term "playhouses." (*See* ECF No. 46 at 37-38). Yet, in its Motion, it briefly argues that the term "playhouses" in Section 22-136(D), which is an exception to the section regulating "adult entertainment establishments," is unconstitutionally vague. (ECF No. 68 at 16). As explained, *supra*, at Section II (G), B&G cannot amend its SAC by a summary judgment motion. And even if it had included this claim in the SAC, it would be without merit**.** The term is in a phrase that reads "arts and cultural performance theaters and playhouses" and is in a paragraph that exempts "accredited universities, colleges or other educational institutions; libraries, art galleries, museums, art exhibits and galleries open to the public…or commercial professional photography and portrait studios which may use nude subjects for their photographs or portraits." *See* Sustainable 2015 Opa-Locka Land Development Regulations, Art. XI at § 22-136(D). When considering the term "playhouses" in this context and in light of its dictionary meaning as a "theater," (ECF No. 80 at 15), a reasonable jury would conclude that it gives "fair warning of the conduct proscribed, in light of common understanding and practices." *Stansberry*, 613 F.2d at 1289.

27

read as a whole, provides the necessary measure of certainty and is not unconstitutionally vague.").

B&G also argues that the definition of "Adult business" is unconstitutionally overbroad because it "has the potential to apply to a wide variety of conventional or 'mainstream' performances…." (ECF No. 68 at 17). An ordinance is "facially invalid under the First Amendment only if it is "substantially overbroad, that is, its application would be unconstitutional in a substantial proportion of cases." *Ward v. County of Orange*, 217 F.3d 1350, 1355 (11th Cir. 2000) (citation omitted). Overbreadth exists "when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech." *Id*. at1355 (citation omitted). Overbreadth is a "strong medicine" to be used "sparingly and only as a last resort." *Curves, LLC v. Spalding County, Ga.*, 685 F.3d 1284, 1290 (11th Cir. 2012) (citation omitted).

Viewed in this context, B&G's overbreadth argument is without merit. The definition of "Adult business" is explicitly limited to those performances, images or recordings that have, as their *primary or dominant theme*, subject matter depicting, describing or relating to specified sexual activities or specified anatomical areas. *See* SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. XI at § 22-238. This limitation contradicts B&G's assertion that "[t]he definition also would include fleeting presentations of nudity, no matter how brief." (ECF No. 68 at 17). The definition also does not apply to all businesses, but only those that must restrict entrance to patrons eighteen years of age and older. *See* SUSTAINABLE 2015 OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. XI at § 22-238.

28

Moreover, "to establish unconstitutional overbreadth, the danger to the suppression of First Amendment rights must be both 'real' and 'substantial'." *Curves,* 685 F.3d at 1292 (citation omitted). B&G has not shown this. Indeed, the City's Land Development Regulations do not ban adult businesses. Section 22-81 only limits their location to the I-2 or I-3 zones.

Based on the foregoing, no reasonable jury could conclude that the definition of "Adult business" in Section 22-238 of the City's Land Development Regulations is unconstitutionally vague or overbroad. The City is therefore entitled to summary judgment on Count VI.

### G.   The City is Entitled to Summary Judgment on Count VII

B&G argues that the definitions of "Nudity, partial," "Nudity, total," and "sexual conduct" in section 4-16 of the City's Code of Ordinances are unconstitutional.[15] (ECF No. 46 at ¶¶ 156-160; ECF No. 68 at 16, 18). B&G begins with the argument that the term

---

[15] "*Nudity, partial*" is defined as "the exhibition by any female person to any other person of any portion of her breasts falling below the areola, or any simulation thereof (which definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided the areola is not so exposed). CITY OF OPA-LOCKA, FLA., CODE OF ORDINANCES CH. 4, ART. II at § 4-16 (3).

"*Nudity, total*" is defined as "the showing of all or any portion of the cleft of the human male or female buttocks with less than a full opaque covering; the showing of all or any portion of the female areola; the depiction of covered male genitals in a discernible turgid state; the exhibition by any person to any other person, of his or her genitals, public area, vulva, anus, anal cleft or cleavage, or any portion of the foregoing specified anatomical areas, or any simulation thereof." *Id*. at § 4-16 (4).

"*Sexual conduct*" is defined as "any sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, any sexual act which is prohibited by law, touching, caressing or fondling of the breasts, buttocks or any portion thereof, anus or genitals or the simulation thereof." *Id*. at § 4-16 (6).

"simulation," which is included in each of the definitions, is overbroad. (ECF No. 46 at ¶ 160; ECF No. 68 at 18). This argument is without merit.

In *Curves*, the Eleventh Circuit considered whether an ordinance which regulated the performance or simulation of "any specified sexual activity" was too broad. *Curves*, 685 F.3d at 1290-91. The plaintiffs in *Curves* argued that that definition of "specified sexual activity" was overbroad "because, among other reasons, it bans 'simulated' conduct…." *Id.* at 1291. The Eleventh Circuit disagreed. The *Curves* Court reasoned that the ordinance "does not inherently ban nude dancing at all, even nude dancing that includes 'simulated' conduct and 'erotic touching.' [It] just disallows such acts in a commercial venue *where alcohol is sold*." The statute is not overbroad on this basis." *Id.* (emphasis in original).

Here, the challenged definitions are found in Chapter 4, Article II of the City's Code of Ordinances. Chapter 4 is titled "Alcoholic Beverages" and Article II is titled "Total or Partial Nudity and Sexual Conduct in Alcoholic Beverage Establishments." CITY OF OPA-LOCKA, FLA., CODE OF ORDINANCES CH. 4, ART. II. As in *Curves*, the term "simulation" is not unconstitutionally overbroad because the ordinance is limited to commercial venues where alcohol is sold (*i.e.,* alcoholic beverage establishments).

Next, B&G turns to the definition of "sexual conduct" and, in particular, two phrases included therein: "any sexual act which is prohibited by law" and "caressing or fondling." CITY OF OPA-LOCKA, FLA., CODE OF ORDINANCES CH. 4, ART. II. at § 4-16 (6).  In the SAC, B&G alleged that those phrases are unconstitutionally vague. (ECF No. 46 at ¶ 159). In its

30

Motion for Summary Judgment B&G abandoned that claim, and adopted a new one: that those terms are overbroad.

According to B&G, its "principal vagueness claim centers on the undefined term 'playhouse'…." (ECF No. 87 at 17).[16] B&G then explained that "[t]he definitions in Chap. 4, Art. II, § 4-16 are certainly vague, but their problem is **not** that they regulate Plaintiffs' particular format in an **uncertain** manner, but rather, that they also regulate the speech of third parties who are *not* properly subject to the Ordinance." (ECF No. 87 at 18) (bold emphasis added; italicized emphasis in original); *see also* (ECF No. 68 at 17 n.8) (acknowledging that "[i]n their Complaint, Plaintiffs identified the portion of the ordinance addressing 'caressing or fondling'…as being vulnerable to a vagueness challenge" and asserting that "[h]owever, that portion of the Code is better analyzed under overbreadth principles.").

B&G is bound by its claim as pled in the SAC. "It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings." *GeorgiaCarry.Org., Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) (citations omitted); *see also Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) (explaining that in her amended complaint, the plaintiff "alleged one theory of supervisory liability" and then in her brief in opposition to summary judgment "asserted an alternative theory of supervisory liability" that was a "distinct ground for supervisory

---

[16] This too, is a claim that B&G first made in its Summary Judgment Motion. *See* n. 14, *infra.*

liability" such that the plaintiff could not raise the new theory in a brief in opposition to a motion for summary judgment without first moving to amend the complaint).

B&G attempts to justify its belated amendment by asserting that the concepts of vagueness and overbreadth "are very closely connected and are often confused by the Courts themselves." (ECF No. 94 at 10). B&G contradicts itself by elsewhere recognizing that the two concepts are "distinct," (ECF No. 87 at 18), and, as the Court's earlier discussion of these topics makes clear, they are governed by different legal standards.

B&G's other purported justification also rings hollow. B&G hypothesizes that "[t]he City clearly understood what was intended as it fully responded to Plaintiffs' arguments in its summary judgment briefing"- suggesting that the City understood the SAC to make an overbreadth claim. (ECF No. 94 at 10). The record does not support this at all. In its response to B&G's Motion, the City argued first, that B&G should not be allowed to alter its claim through summary judgment, and then, second, responded to the substantive arguments B&G raised. (ECF No. 85 at 11-14). This was an entirely reasonable response to B&G's change of position. It cannot be used to construe the SAC to plead something that it did not.

In sum, the term "simulation" is not overbroad as a matter of law, and B&G cannot seek summary judgment on the basis that the phrases "any sexual act which is prohibited by law" and "caressing or fondling" are overbroad, because they did not raise this claim in the SAC. Further, B&G readily admits that those phrases are not unconstitutionally vague. (*See* ECF No. 87 at 18). Accordingly, the definitions of "Nudity, partial," "Nudity, total,"

and "sexual conduct" in section 4-16 of the City's Code of Ordinances are not unconstitutional and the City is therefore entitled to summary judgment on Count VII.

### H.   Neither Party is Entitled to Summary Judgment on Count VIII

B&G claims that the City's Sign Code, which is set forth in Article X of the Code, violates the First Amendment because it is comprised of content-based regulations and constitutes a prior restraint. (ECF No. 46 at ¶¶ 163-197; ECF No. 68 at 19-20). B&G cites to several provisions of the Sign Code that it contends reflect distinctions based upon the content of the sign or the identity of the speaker: (i) the provision at X-20-21 which exempts certain signs, such as political signs and signs for city sponsored or city approved events, from the permit requirement; (ii) the provision at X-43 which allows theaters, playhouses and other similar cultural or civic establishments to display multiple signs; (iii) the provision at X-60 which prohibits various signs, including "signs that exhibit thereon any lewd, obscene, offensive, or lascivious matter;" and (iv) the provision at X-61 which prohibits signs advertising real estate to bear the realtor's picture. (ECF No. 68 at 19-20).

The City's only argument is that B&G does not have standing to raise a facial challenge to the Sign Code because "[t]he City's sign regulations do not grant unbridled discretion to the City Manager." (ECF No. 85 at 17).  The Supreme Court has "long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 755–56 (1988) (collecting cases). The Court previously held that B&G has standing to bring a facial challenge to the

33

Sign Code. (ECF No. 67 at 18-20; ECF No. 98). As explained below, my conclusion remains the same.

The City contends that B&G cannot show that the City Manager was vested with unbridled discretion because the Sign Code requires the City Manager to grant or deny a sign permit within 30 days based upon "objective" criteria. (ECF No. 80 at 19). The City is correct that the Sign Code provides a 30-day deadline in which to grant or deny a sign permit, but I cannot agree that the criteria used is "precise and objective." *Lady J. Lingerie*, 176 F.3d at 1361. The Sign Code states that "[i]n reviewing the sign plan the City Manager or designee shall determine if the following criteria has been met:

> That the signage for the project is in keeping with the overall architecture and character of the building development, etc.
>
> That the signage for the project is designed to meet the directional needs of the project for communication, identification, way finding, regulatory and informational messages in keeping with the overall architectural theme of the development or project.
>
> That the signage proposed is legible, conspicuous and easily readable.
>
> That the visibility and impact of the type of sign, number of signs, design, size, method of, construction, illumination and location of the proposed signs are in compliance with the minimum standards of this Ordinance, and does not adversely impact adjoining properties, or create a hazard of health risk.
>
> That the proposed signage is consistent and not in conflict with the intent and interests of the City of Opa-locka, as stated in the policy adopting this code."

*See* SUSTAINABLE OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. X at X-14. The Sign Code further provides that "[t]he City Manager or designee shall have authority to refuse the issuance of or revoke any license or permit issued under the provisions of this article if the application submitted shall not comply with the provisions in this article." *Id.* at X-15.

The City glosses over these criteria and does not explain how they meaningfully limit the City Manager's discretion. The last criterion is the most obvious example of the broad discretion given to the City Manager, who can grant or deny a permit depending upon whether the proposed signage "is consistent and not in conflict with the intent and interests" of the City. SUSTAINABLE OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. X at X-14. This provision "is neither precise nor objective." *Lady J. Lingerie*, 176 F.3d at 1362. The same is true of the first criterion, which empowers the City Manager to make a permitting decision based upon whether the proposed signage "is in keeping with the overall architecture and character of the building development, etc.." SUSTAINABLE OPA-LOCKA LAND DEVELOPMENT REGULATIONS, ART. X, X-14.

For these reasons, I again conclude that B&G has standing to assert a facial challenge to the Sign Code.

Having established that B&G has standing, I turn to the merits of its claim. As noted earlier, content-based laws are only permissible if they satisfy strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 163 (citations omitted). The City makes no attempt to demonstrate that the Sign Code is content-neutral. The City's

tacit concession that the Sign Code is a content-based regulation is unsurprising given that the provisions referenced above plainly single out specific subject matter and specific speakers for differential treatment. *Id*. at 169. Since the City does not dispute that the Sign Code is a content-based regulation, it must demonstrate that the Sign Code satisfies strict scrutiny. The City makes no attempt to do so. Given that the undisputed material facts establish that the Sign Code is a content-based regulation, and the City fails to demonstrate that the stringent requirements of strict scrutiny have been met, the Sign Code violates the First Amendment as a matter of law.[17]

However, that is not the end of the inquiry. The City has invoked the doctrine of unclean hands. (ECF No. 85 at 18-20; ECF No. 101 at ¶ 54). This doctrine "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co*., 324 U.S. 806, 814 (1945). To assert an unclean hands defense, a defendant must first demonstrate that the plaintiff's wrongdoing is "directly related to the claim against which it is asserted" and second, that the defendant "was personally injured by [the wrongful] conduct." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993) (citations omitted).

---

[17] Having reached this conclusion, the Court need not address B&G's argument that the Sign Code is also an unconstitutional prior restraint.

Importantly, the unclean hands doctrine "traditionally applies only to equitable remedies and does not bar a plaintiff from recovering damages."[18] *Royal Palm Properties, LLC v. Premier Estate Properties, Inc.*, No. 10-80232-CV, 2010 WL 3941745, at \*2 (S.D. Fla. Oct. 6, 2010) (citing *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979)).

In its reply memorandum,[19] B&G cites a Seventh Circuit case that, in dicta, observed that an unclean hands defense may "have more limited play in free-speech cases than elsewhere… [although] [o]ccasional application of the doctrine in First Amendment cases may be proper and even necessary…." *Shondel v. McDermott*, 775 F.2d 859, 869-70 (7th Cir. 1985). B&G, however, has cited no decision that held the defense is inapplicable to a First Amendment claim, and this Court knows of none. B&G does cite authority for the proposition that if proven, the defense may "inform the scope and nature of the relief to be afforded." (ECF 94 at 8) (citing *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 Fed. App'x 147, 150 (3d Cir. 2019) and *Shondel*, 775 F.2d at 868). This is something the Court can address at trial.

In sum, I find that the unclean hands doctrine is an available defense for the City. I also find that that defense cannot be resolved on summary judgment. The City argues that B&G acted with unclean hands because it misrepresented the proposed use of its property

---

[18] For this reason, the City's unclean hands defense does not defeat entry of summary judgment for B&G on liability on Counts I and II, because there B&G seeks compensatory damages in addition to equitable relief. (*See* ECF No. 46 at 19, 24).

[19] *See* ECF No. 94 at 8.

as "playhouse, bar, tavern" on its applications for an occupational license and certificate of use, as well as on their zoning verification form. (ECF No. 85 at 19-20). B&G denies doing so, asserts that City officials knew the proposed use was for an adult business, and claims that City personnel suggested the "playhouse, bar, tavern" description, which the City denies. (ECF No. 69 at ¶¶ 7-10; ECF No. 86 at ¶ 11; ECF No. 88 at ¶¶ 15-19; ECF No. 94 at 9). These are genuine disputes of material fact whether B&G engaged in the misconduct the City alleges amounts to B&G's unclean hands. Accordingly, summary judgment on Count VIII is not warranted.

## III.    RECOMMENDATION

For the foregoing reasons, I **RESPECTFULLY RECOMMEND** that the Court **GRANT IN PART** Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 68), enter judgment as a matter of law in Plaintiffs' favor as to liability on **Counts I and II** of the Second Amended Complaint and otherwise deny the Motion. I **FURTHER RECOMMEND** that the Court **GRANT IN PART** Defendant City of Opa-locka's Motion for Summary Judgment, (ECF No. 80), enter judgment in the City's favor on **Counts V, VI and VII** of the Second Amended Complaint, and otherwise deny the Motion.

## IV.    OBJECTIONS

**No later than September 25, 2020,** both parties may file any written objections to this Report and Recommendation with the Honorable Darrin P. Gayles, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), *Henley v.* Johnson, 885 F.2d

790, 794 (11th Cir. 1989), 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016). No responses to

any objections shall be filed absent an order of the Court.

RESPECTFULLY SUBMITTED in chambers at Miami, Florida, this 11th day of

September, 2020.

CHRIS McALILEY
UNITED STATES MAGISTRATE JUDGE

cc:  The Honorable Darrin P. Gayles
     Counsel of record